[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 7, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-15171
Non-Argument Calendar

_____

Agency No. A79-437-248

MIRIAN SALLAKU,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(September 7, 2005)

Before BLACK, HULL and PRYOR, Circuit Judges.

PER CURIAM:

Mirian Sallaku, through counsel, petitions for review of the Board of Immigration Appeals' ("BIA") order: (1) affirming the Immigration Judge's ("IJ") order denying his applications for asylum, withholding of removal, and CAT relief; and (2) concluding that the IJ did not violate Sallaku's due process rights. After review, we deny Sallaku's petition.

## I. BACKGROUND

### A. Sallaku's Arrival

On March 5, 2002, Sallaku, a native and citizen of Albania, arrived in Miami International Airport and attempted to enter the United States on a false Slovenian passport. Sallaku stated to an INS officer that he was a citizen of Albania entering the United States in search of political asylum.[1]

At the time of his arrival, Sallaku provided a sworn statement to an INS officer that he: (1) was arrested in Albania in 1991 while participating in a political demonstration against the "old dictator"; (2) was denied university admission in 1991 on account of his family's political beliefs; (3) subsequently lived in Germany until 1997 and was arrested again when he returned to Albania in 1997; (4) applied for (but was denied) an American visa in 2001; (5) was threatened by

---

[1]We acknowledge that under the Homeland Security Act of 2002, the INS was abolished and its functions were transferred to the newly-created Department of Homeland Security ("DHS"). See Yang v. United States Att'y Gen., – F.3d –, 2005 WL 1789659, at *6 (11th Cir. July 29, 2005). However, in this case, we still refer to the INS.

men in blue masks, armed with machine guns near his house in October 2002 during elections; and (6) left Albania because he was afraid of the political situation due to his (and his father's) involvement in a political organization, the Albanian Society for the Politically Persecuted People ("ASPPP").

On March 12, 2002, the INS interviewed Sallaku and determined that he had a credible fear of persecution. At the interview, Sallaku indicated that he was arrested and detained for three days in 1991 because he was a member of ASPPP and had demonstrated against the government. Because of his continued involvement in ASPPP, Sallaku had been approached by an Albanian official in August 2002 and told that he would be jailed if he continued to make anti-government statements.

The INS then served Sallaku with a notice to appear, charging him with removability as an alien who fraudulently attempted to procure admission into the United States, 8 U.S.C. § 1182(a)(6)(C)(i), and as an immigrant not in possession of a valid entry document, 8 U.S.C. § 1182(a)(7)(A)(i)(I). During the September 26, 2002 hearing before the IJ, Sallaku conceded his removability and requested political asylum, indicating that he would file an application for asylum.

At the hearing, the INS submitted the Department of State Country Report on Human Rights Practices in Albania for 2001 ("2001 Country Report"). According to the 2001 Country Report: (1) Albania is a republic with a multiparty

3

parliament, with the Socialist party holding the majority of parliamentary seats; (2) local police in Albania have committed human rights abuses, including beating detainees and prisoners, and arbitrarily arresting persons and prolonging their detention; (3) the opposition party, the Democratic Party ("DP"), credibly had reported incidents of police harassment of its members; and (4) DP supporters had charged police with attacking them while they rallied.

**B.      The Asylum Application**

On October 17, 2003, Sallaku filed an application for asylum and withholding of removal, which contained these statements.  Sallaku's family had opposed the Albanian communist regime since 1965.  The communist leaders thus imprisoned two uncles for 25 years for their political beliefs, murdered another uncle, and tortured his father.

Because of his opposition to the Albanian government, Sallaku was imprisoned in 1991 and 1997.  Sallaku is a member of the opposition party, the DP, and a member of the ASPPP, an organization that helps former persecutees "rebuild their lives."  Sallaku was threatened and beaten by people controlled by the Albanian government.  For example, Sallaku was arrested on February 8, 1991, for his participation in the DP and was interrogated and detained in isolation for ten days.  During this detention, Sallaku was beaten twice daily with rubber sticks (at 10:00 a.m. and 6:00 p.m.) by men wearing masks and was fed "every two

4

days." Sallaku was asked to testify against friends, but refused, and was told that he would be executed without trial. After ten days in isolation, Sallaku was transferred to a cell with other protestors, who were released on March 15, 1991. Sallaku went to Germany in 1991 in search of higher education and returned to Albania in 1997.

Sallaku was arrested a second time on July 5, 1997, for organizing and participating in illegal gatherings following elections on June 29, 1997. After being detained for 24 hours, he was released on bond. Upon being released, Sallaku was ordered to get into an army jeep with three men. The men drove Sallaku to a limestone mine at Dajti mountain, removed him from the jeep, and placed one revolver in his mouth and pointed one on each side of his head. The driver told Sallaku that he could shut up and stay home with his mother or join his friend at the bottom of the mine. Sallaku remained silent and after 15 minutes, he was returned to the jeep and driven home. After this incident, Sallaku minimized his actions against the socialist government for a few years.

On February 2, 2002, while with two friends, Sallaku was pulled aside by two men who sprayed him with gasoline and told him that his days were over and

that this was the end of the Sallaku family.  At that point, Sallaku decided that his

life was in danger and that he had to leave Albania.[2]

## C.    The Asylum Hearing

At the asylum hearing, Sallaku submitted newspaper articles describing the

arrest and imprisonment of his uncles and the death of a third uncle.  The INS

submitted the 2001 Profile of Asylum Claims and Country Conditions on Albania

("Asylum Profile"), which indicated that: (1) in 1997, Albania was brought close

to anarchy when various "pyramid schemes" collapsed and caused many citizens to

lose their life savings; (2) the June 1997 election brought the Socialist party to

power and represented "the first step on the road to normalcy;" and (3) since 1997,

Albania steadily has resumed normalcy.  The Asylum Profile also stated that most

claims based on political opinion are because of mistreatment of the applicants

during the communist regime between 1945 and 1990, and that "[w]ith the socialist

party currently leading a coalition government, it is highly unlikely in today's

circumstances that many applicants will have credible claims to political

persecution."  The Asylum Profile further stated that most asylum claims:

> are generally amplified by the assertion that a reconstituted
> communist regime has come to power.  Claims relying on this premise
> are contradicted by virtually all state actions, and those who truly
> were persecuted by the communists resent the comparison.  Both

---

[2]In support of his application, Salluku also submitted many documents, including
government documents and affidavits from friends.

> major parties trace their roots to the communist regime and both repudiate it thoroughly . . . There is virtually no evidence that individuals are targeted for mistreatment on political grounds . . . Applicants often cite current membership in the non-profit [ASPPP] formed after the 1992 elections, although documents apparently provided by it cannot be vouched for.

Finally, the Asylum Profile advised that: "Adjudicators should explore all the motivations an applicant might have for requesting asylum, including family members already present in the United States. . . . It bears repeating the vast majority of asylum claims involve economic, not political considerations."

The INS also submitted the 2002 Department of State Country Report on Albania, which essentially was the same as the 2001 Country Report. Finally, the INS filed a Forensic Document Laboratory Report from the U.S. Department of Justice, stating that two of the government documents Sallaku submitted could not be authenticated because the documents: (1) lacked security features and reliable indicia of the source of origin; (2) did not have official government letterheads; and (3) were produced by ink jet or laser copier technology, which is not the expected production process for important government documents.

At the asylum hearing, Sallaku testified that he: (1) presently resides in Florida with his sister and her family, and his parents; and (2) has no remaining close relatives in Albania. When asked to describe his arrests, he testified:

7

The first arrest took place on February 1990. I participated in one of these anti-government activities. And I was kept for a long time in detention for one month. And during this one month period of time I was threatened to death, I was beaten up by rubber sticks, and I could not tell these faces of the people that were beating me up because their faces were covered. Masks were on their faces . . . The beating went along with curses, threats against me like you wanted the changes . . . Your luck will follow your uncle's luck . . .

He testified further that: (1) they fed him green soup and a hard piece of bread once a day; (2) sometimes, he was kept in a big room that measured four meters by four meters, and other times, he was kept in an isolation room that measured one-half meter by one-half meter; (3) he spent almost two weeks in the isolation room; (4) he "looked like a zebra" and "was totally swollen, black and white stripes," when he was released; and (5) it took him five to six months to recover. According to Sallaku, he was arrested because of his activities as a member of the DP.

Regarding his arrest in 1997, Sallaku testified that: (1) he was taking part in a protest against the result of an election wherein the socialist party regained power; (2) he was taken directly to prison and held for less time than the previous time; (3) he was mistreated with rubber sticks; and (4) he was taken to the Dajti mountain area, where "a gun was put to [his] head," and he was given warnings. Sallaku additionally testified that, in 2002, (1) he was working at a restaurant that was a gathering place for members of the DP; (2) the Albanian Secret Intelligent Service, the "Shish," heard about their meetings; (3) one day, he was coming out of

8

the restaurant with some friends, including Armand Binga and Xhemacle, and he spotted a "Marks 505 model red Perchot" following them; (4) the car blocked their path, and two people got out and grabbed his throat, shouting at him; (5) then they sprayed gas on him; and (6) he thought that his life was over, but he heard them receive a command from their walkie-talkie radio, and they left the scene. At that moment, Sallaku made the decision to leave Albania.

On cross-examination, Sallaku clarified that, regarding the 1997 incident: (1) the driver held a gun to his head; (2) the other two guards, who also had guns, stood at the side and pressured him with threats; and (3) they were not wearing masks, meaning that they were prepared to execute him. When asked whether one of the individuals was holding a gun in his mouth, he explained: "I indicated that that was in front of mouth. That was right here in my mouth in my head. I mean, if I have to specify every part of my head, I'll do. And two people were aside." Sallaku was "totally traumatized" by the event.

When asked to clarify how often he was fed while in prison in 1991, Sallaku responded that the government did not pay attention to a feeding schedule and sometimes fed them once a day and sometimes fed them once every two days. Because of the trauma, Sallaku sometimes was not in the best position to recreate exactly what had happened to him. Sallaku was beaten several times a day, whenever the guards felt like it. Sallaku went to Germany on December 25, 1991,

9

to study agriculture and stayed there until May 1997. Sallaku did not finish his degree because he had to return to Albania out of concern for his family's safety.

When asked why his parents, who lived in Albania in 1997 and 2002, had not come to testify and had not filed affidavits to corroborate his testimony about the incidents, Sallaku responded he did not know that it was necessary, and if it were necessary, they were willing to testify. When asked whether his proposed witness, Nick Zekadie, had any first-hand knowledge regarding the incidents of 1997 or 2002, Sallaku stated that Zekadie had been in the United States for 15 years, explaining that Zekadie's knowledge came from the conversations that he had had with Sallaku about Sallaku's experiences. The IJ inquired as to the purpose of Zekadie as a witness, and Sallaku responded that he would testify as to the conditions in Albania. The IJ responded that the INS had submitted sufficient evidence as to the country conditions. The IJ stated:

> I think [Sallaku's parents] would have been witnesses that could have at least testified when they saw their son shortly after the events that he claims that were pertinent that led to his decision to leave. I'm not going to ask that witness outside [to] come in because I believe the best evidence is the Profile and Country Report and not someone[] who has lived in the United States for a decade and a half and merely made some revisits back to his native country to tell me what his impressions of Albania are today. I think, if anything, that would really cloud the evidence that we have on the record.

**D. The IJ's Decision**

10

In an oral decision, the IJ found that Sallaku had failed to establish his eligibility for relief, noting that: (1) Sallaku had resided in Germany for approximately six years, between 1991 and 1997, but did not seek asylum there; (2) his testimony about being taken to the mountains and threatened with a gun was not as detailed as in his asylum application, calling into question whether the event was "quite as chilling" as he had written; (3) his testimony about the 2002 incident was not as specific as in Xhemacle's affidavit; and (4) his parents, who were present in Florida at the time of the hearing, did not testify. The IJ acknowledged that Sallaku had provided evidence that his uncles had problems during the communist regime in Albania, but noted that, since the forensic report questioned the authenticity of two documents submitted by Sallaku, he had concerns as to the reliability of all of the documents that Sallaku submitted. The IJ further acknowledged that Albania had not yet fully recovered from the dissolution of its communist government in 1991, but noted that, according to the 2001 Country Report and the Asylum Profile: (1) the last elections in Albania were deemed fair, and, although the socialist party held a small majority in Parliament, the DP did have a presence there; and (2) it was highly unlikely that there could be a credible claim of persecution based on one's association with the ASPPP or with the DP, as many asylum applicants simply fear a reprise of the former communist regime, based on their family members' past persecution.

11

The IJ further found that:

> The respondent may have actually been a member of the [DP] himself as the documents suggest . . . But the [c]ourt has found that the respondent has failed to provide sufficient detail regarding the . . . events . . . in . . . 1997, and the last incident in February of 2002. The respondent's testimony simply lacked the type of chilling, searing testimony that one would normally provide on these last events . . . The respondent's affidavits and supporting documents are much more detailed than his [testimony]. And corroborating evidence, such as his parents, seem to be available . . . which might have bolstered or supported his testimony or lack thereof. Yet the respondent has failed to provide them to the [c]ourt to further analyze the documents, the questionable authenticity of some of the most probative documents submitted regarding his prison detention and release, and the arrests by the [s]ecret police . . .

The IJ concluded that Sallaku had failed to provide sufficient, credible, and detailed evidence to meet his burden of proof, and, "[a]s such, the [c]ourt finds that the respondent has also failed to establish a level of past persecution that could be deemed to be reliably credible, or to meet the higher burden for withholding of removal. . . ."

**E.    Appeal to the BIA**

Sallaku appealed to the BIA, which adopted and affirmed the IJ's decision, and dismissed Sallaku's appeal. The BIA also found that the IJ had not violated Sallaku's due process rights by preventing Zekadie from testifying because: (1) Sallaku admitted that Zekadie did not have first-hand knowledge regarding the incidents upon which Sallaku's asylum application was based; and (2) Zekadie had

12

been living in the United States for the past 15 years, yet was going to testify about the present conditions in Albania. The BIA additionally noted that, when asked why he did not bring his parents to testify, who did have first-hand knowledge of the events, Sallaku stated that he did not know it was necessary.

## II. DISCUSSION

### A. Adverse Credibility Determination

On appeal, Sallaku challenges the IJ's conclusion, affirmed by the BIA, that he failed to demonstrate past persecution.[3]

The IJ's factual determinations are reviewed under the substantial evidence test, and this Court should "affirm the [IJ's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Forgue v. United States Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005). "Credibility determinations likewise are reviewed under the substantial evidence test." D-Muhumed v. United States Att'y Gen., 388 F.3d 814, 818 (11th Cir. 2004).

---

[3]This Court should review the BIA's decision, "except to the extent that it expressly adopts the IJ's opinion." Al Najjar v. Ashcroft, 257 F.3d 1262, 1284 (11th Cir. 2001) (internal citations omitted). "Insofar as the [BIA] adopts the IJ's reasoning, [this Court should] review the IJ's decision as well." Id. (internal citations omitted). Here, because the BIA expressly adopted the IJ's decision as to the adverse credibility determination and the merits of the claims, this Court reviews the IJ's decision under the substantial evidence test. See id.

13

An alien is entitled to asylum if he can establish, with specific and credible evidence: (1) past persecution on account of religion or other statutorily listed factor; or (2) a "well-founded fear" that his religion or other statutorily listed factor will cause future persecution. 8 C.F.R. §§ 208.13(a), (b); Al Najjar v. Ashcroft, 257 F.3d 1262, 1287 (11th Cir. 2001). If an alien is unable to meet the "well founded fear" standard for asylum, "he is generally precluded from qualifying for either asylum or withholding of [removal.]" Id. at 1292-93. Similarly, the burden on the alien seeking CAT relief is higher than the burden imposed on the asylum seeker. Id. at 1303.[4]

"The trier of fact must determine credibility, and this [C]ourt may not substitute its judgment for that of the IJ with respect to credibility findings." D-Muhumed, 388 F.3d at 818. "[A]n adverse credibility determination alone may be sufficient to support the denial of an asylum application" when there is no other evidence of persecution. Forgue, 401 F.3d at 1287. "Once an adverse credibility finding is made, the burden is on the applicant alien to show that the IJ's credibility decision was not supported by specific, cogent reasons or was not based on

_____

[4]As a preliminary matter, contrary to Sallaku's argument on appeal, the IJ did make a finding that Sallaku had not suffered past persecution, as the IJ explicitly found that, because Sallaku had failed to provide sufficient, credible, and detailed evidence, he "also failed to establish a level of past persecution that could be deemed to be reliably credible, or to meet the higher burden for withholding of removal. . . ." In addition, because the BIA expressly adopted the IJ's findings, it was not required to make its own finding regarding past persecution.

14

substantial evidence." Id. (citations omitted). "A credibility determination, like any fact finding, may not be overturned unless the record compels it." Id. (internal quotations and citations omitted).

Sallaku relied on three main incidents to establish past persecution: (1) in February of 1990 or 1991, he was arrested, detained, and beaten on a daily basis for 30 days; (2) in 1997, he was detained for 24 hours and taken to the mountains where he was threatened by people who held guns to his head; and (3) in February of 2002, men stopped him and sprayed gasoline on him as they threatened him.

Substantial evidence supports the IJ's conclusion that Sallaku's testimony about these three incidents was not credible and did not satisfy his burden of establishing past persecution. A careful comparison between Sallaku's testimony, his asylum application, his credible fear interview, and his sworn statement taken by the INS reveals some inconsistencies, including: (1) Sallaku initially stated, during the asylum hearing and in his sworn statement, that he was arrested in 1990, but later acknowledged that it was in 1991; (2) his application stated that he was fed every two days during his 1990 detention, yet, he testified that he was fed sporadically; (3) at the credible fear interview, Salluku told the asylum officer that he was imprisoned for only three days in 1991, whereas, in his asylum application and at the hearing, he maintained that he was imprisoned for a month; and (4) his application stated that during the 1997 incident, three guns were pointed at him and

15

the driver threatened that he could end up at the bottom of the mine, yet, at the asylum hearing, he testified that only one gun was pointed at him, and he did not mention the mine. Also, Sallaku traveled to Albania from Germany and failed to apply for asylum in Germany (where he stayed from 1991-97) following his alleged persecution in 1991.

Further, in his asylum application, Sallaku's story is vague concerning the 2002 gasoline incident, as he stated only that he essentially was covered in gasoline by two men. However, at the hearing, he testified as to the color and make of the car driven by his alleged attackers, and generally provided more detail about the incident. In addition, as the IJ noted, Xhemacle's affidavit was more detailed than Sallaku's testimony, and contradicted Sallaku's testimony as to the color of the car.

In his sworn statement to the INS, Sallaku stated that, in October 2001, he was threatened near his house by masked men dressed in blue, armed with machine guns, a claim that he did not mention again. Therefore, the record does contain a number of inconsistencies.

Also telling with regard to Sallaku's credibility is the Asylum Profile, which stated that claims by Albanian nationals based on political grounds are likely to be incredible, and that such claims are usually amplified by the assertion that a reconstituted Communist regime has come to power. This is the exact claim that Sallaku made in his asylum application. Indeed, the Asylum Profile cautions

adjudicators to look closely at claims such as Sallaku's, and explore other motivations that the claimant may have, including family members already present in the United States. Notably, all of Sallaku's immediate family members reside in the United States, and he has no close relatives in Albania.

Additionally, while Sallaku testified that he resided with his parents in Florida, and resided with them when he lived in Albania, they did not testify or provide corroborating affidavits. Although Sallaku testified that he was not aware that his family members could be witnesses, his attorney stated that he had asked Sallaku for any witnesses who may know about his claim. Moreover, as the IJ noted, two of Sallaku's supporting documents could not be authenticated, further casting doubt upon the credibility of his claim.

Given the above-mentioned inconsistencies and the additional evidence casting doubt on the credibility of Sallaku's claim, the record does not compel reversal of the IJ's adverse credibility determination. See Forgue, 401 F.3d at 1287. Accordingly, substantial evidence supports the IJ's determination that Sallaku failed to establish his eligibility for asylum, and, because he has failed to do so, he likewise has failed to establish eligibility for withholding of removal and CAT relief. See Al Najjar, 257 F.3d at 1292-93.

**B.    Salluku's Due Process Claim**

Salluku also argues that the BIA erred by finding that his due process rights were not violated when the IJ refused to allow him to present Zekadie's testimony. Sallaku contends that under <u>Forgue</u>, the IJ is required to consider all of the evidence offered by an asylum applicant.[5]

In order to prevail on a due process challenge, an alien must establish that he was deprived of liberty without due process of law and that the IJ's errors caused him substantial prejudice. <u>Lonyem v. United States Att'y Gen.</u>, 352 F.3d 1338, 1341-42 (11th Cir. 2003). In a removal proceeding, an alien shall have "a reasonable opportunity to introduce evidence on [his] own behalf." 8 U.S.C. § 1534(c)(2). Further, the alien, at any time during the hearing, may request that the IJ issue a subpoena for the presence of a witness "upon a satisfactory showing that the presence of the witness is necessary for the determination of any material matter." 8 U.S.C. § 1534(d)(1).

Sallaku has not established that the proposed witness' testimony was "necessary for the determination of any material matter." <u>See id.</u> As the BIA noted, Sallaku wished to have Zekadie testify as to Albania's country conditions, yet, he admitted that Zekadie had not lived in Albania for 15 years and would be testifying based only on his occasional visits to the country. In addition, as the IJ

_____

[5]This Court reviews <u>de novo</u> an alien's constitutional challenges. <u>See Lonyem v. United States Att'y Gen.</u>, 352 F.3d 1338, 1341 (11th Cir. 2003).

18

noted, there was ample evidence about Albania's country conditions, and there is no indication that Sallaku was prevented from submitting his own reliable evidence as to Albania's country conditions. Moreover, as the BIA noted, Sallaku admitted that Zekadie had no first-hand knowledge of his problems in Albania. Thus, Sallaku has not established a due process violation.

**PETITION DENIED.**